IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 4:23-CR-91-2 |
| | ) | |
| ROBERT MOSS | ) | |

**GOVERNMENT'S TRIAL BRIEF**

NOW COMES the United States of America, by and through United States Attorney for the Southern District of Georgia Jill E. Steinberg, and files this trial brief to discuss issues that may arise in the trial of the above-mentioned case.

**1. General Factual Allegations**

On October 7, 2021, the victim, Mark Martin, began communicating with an individual he knew as "Shake." Using text message, video messaging, and FaceTime, they discussed completing a drug transaction in Savannah, Georgia. Originally, Martin and "Shake" were to meet on October 7, 2021, however that plan was ultimately changed to October 8th. The location of the meeting was altered several times before the parties agreed upon 11400 White Bluff Road, the Colonial Heights apartment complex, in Savannah, Georgia.

The victim arrived at the location in a silver 2010 Hyundai Genesis registered to his father. Upon arrival, the victim entered a white Ford F150 to meet with "Shake" to complete the transaction. Upon entering the

vehicle, the victim was met by three individuals. "Shake" was in the front passenger seat. The victim had met but did not know the driver and the backseat passenger was a stranger to him. The victim described the backseat passenger as a heavy-set African American similar to an NFL linebacker with a small head.

The victim was carrying a Louis Vuitton bag containing the controlled substances which he provided to "Shake." The backseat passenger then picked up an AR style pistol and handed it to "Shake" before pushing the victim up against the side of the truck. "Shake" pointed the firearm at the victim and the backseat passenger removed property from the victim's person, including his car keys. The perpetrators then engaged in a conversation about what to do with the victim's body after they killed him and discussed taking his car.

The driver exited the vehicle and began heading towards the victim's car. At that point, the backseat passenger noted the victim's cousin walking around the parking lot, ostensibly looking for the victim. The backseat passenger told "Shake" to kill the victim's cousin. "Shake" then exited the vehicle and began shooting at the victim's cousin. The backseat passenger then reached for a handgun on the floorboard of the truck which gave the victim enough space to separate himself from the backseat passenger and exit the rear of the truck. The victim ran away from the truck and was shot in the backside. The victim collapsed on the sidewalk

of the apartment complex. The perpetrators left the F150 in the parking lot and left the complex in the victim's Hyundai Genesis. While leaving the apartment complex, "Shake" left the firearm in a bush.

Officers responded to the scene, interacted with victim and began their investigation. Officers recovered spent shell casings, the firearm, the victim's bloody clothes, and the white Ford F150. A search warrant was later executed on the F150, and a phone was recovered from the map pocket on the backside of the front passenger seat (in front of where the backseat perpetrator would have been sitting). A search warrant execution was later attempted on the phone and a full extraction was unable to be secured but the subscriber information for the phone (including name, iCloud account, and phone number) was recovered. The name associated with the phone is Robert Moss, the defendant.

The victim was interviewed and identified "Shake" in an Instagram screenshot. The person depicted in the screenshot is Graylyn Simmons. Likewise, the victim gave consent for law enforcement to search his cell phone, that had been recovered away from the crime scene. An extraction of that phone showed communications with the number associated, by the victim, with Simmons consistent with setting up a drug transaction. A search of the phone records from the phone number associated to Simmons revealed routine and consistent interactions with the number associated with Moss.

The day following the robbery, October 9, 2021, Brandon Williams received a jail call from the Chatham County Detention Center (CCDC) wherein he explained his involvement with the shooting/robbery. Notably, the F150 was rented to Brandon Williams. The following day, October 10, 2021, the occupant of a different vehicle registered to Williams was observed by police engaging in behavior consistent with drug trafficking, and the Port Wentworth Police Department attempted a traffic stop. The vehicle fled the stop, and the driver was able to elude police after the vehicle stopped in the yard of a residence. A subsequent search of the abandoned vehicle revealed Williams' identification, Williams' cell phone, and the bag containing the controlled substances stolen from the victim during the robbery.

The day following the car chase, Williams received another call from CCDC. In this call, he explained his involvement with the car chase, confirmed that the items recovered were the items stolen during the robbery, and accused the victim of putting out a hit on everyone involved in the shooting, including Williams.

Later, the victim was interviewed again, and he indicated that he had viewed some music videos on YouTube and had viewed an individual that appeared similar to the backseat passenger. The victim did not definitively identify this individual as the perpetrator but did indicate that

4

the individual physically resembled the backseat passenger. Investigators identified the depicted individual as Deandre Johnson.

Simmons' DNA was already in evidence with the Savannah Police Department (SPD) related to a different investigation. An exemplar of Moss' DNA was recovered pursuant to a federal search warrant. DNA exemplars from Simmons and Moss were packaged alongside swabs taken from the firearm recovered from the scene and compared by the Serological Research Institute. The forensic DNA analyst found Extremely Strong Support for the inclusion of Simmons' DNA on the firearm and Strong Support for the inclusion of Moss' DNA on the firearm.

### 2. Witness 5th Amendment Right Invocation

The victim, Mark Martin, certainly has the right to refuse to answer certain questions that may put him in legal jeopardy. *See Minnesota v. Murphy*, 465 U.S. 420, 426 (1984). When a witness seeks to invoke his Fifth Amendment right against self-incrimination the Court is to "make a particularized inquiry, evaluating whether the privilege applies with respect to each area that the questioning party wishes to explore." *See United States v. Taylor*, 652 Fed. Appx. 902, 909 (11th Cir. 2016) (unreported) *citing United States v. Melchor Moreno*, 536 F.2d 1042, 1049 (5th Cir. 1976). "Where parts of a witness' testimony would be material and not incriminating, the [party] must be allowed to call the witness, who should be allowed to invoke the privilege only as to genuinely threatening

5

questions." *See Taylor*, 652 Fed. Appx. at 909 *quoting Melchor Moreno*, 536 F.2d at 1049 (internal quotation marks omitted) (cleaned up).

In this matter, the victim was subpoenaed and brought before the Southern District of Georgia Grand Jury. He provided a recounting of the incident but invoked his right against self-incrimination to two questions.[1] He refused to answer why he was at the crime scene and what was in the bag that was stolen from him. The answers to those questions pose legal jeopardy to the victim. The answer to question one is "controlled substances" and the answer to question two is "to sell the controlled substances." The victim has a right, should he choose, to invoke his Fifth Amendment right with respect to these questions. *See generally United States v. Perez*, 661 F.3d 568, 581 (11th Cir. 2011) *citing Hoffman v. United States*, 341 U.S. 479, 486 (1951).

On the other hand, there is nothing incriminating about traveling to a location, getting in a car, getting robbed, running away, getting shot, receiving medical attention, and having one's car stolen by assailants. The victim can answer all these questions without placing himself in legal jeopardy. The victim answered these questions, and other related questions, in the Grand Jury and with the Government during trial preparation. The Government has every confidence that he will agree to testify to these subject areas and believes he should be allowed to do so.

---

[1] The transcript of the victim's Grand Jury testimony is available for the Court's review should the Court find that necessary.

There is no evidence that the victim will seek, or is entitled to seek, a blanket invocation of his right against self-incrimination.

Of note, it would be improper for the Government to call the victim *solely* for the purpose of him invoking his right against self-incrimination. *See United States v. Feliciano-Francisco*, 701 Fed. Appx. 808, 813 (11th Cir. 2017) (unreported) *citing United States v. Lacouture*, 495 F.2d 1237, 1240 (5th Cir. 1974); *Bowles v. United States*, 439 F.2d 536, 542 (D.C. Cir. 1970). It is not improper for a party to call a witness to elicit non-incriminating information and then for that witness to invoke his rights as to certain questions. *See generally Feliciano-Francisco*, 701 Fed. Appx. at 814. "The Sixth Amendment guarantees a criminal defendant the right to impeach adverse witnesses through cross-examination." *United States v. Barrington*, 648 F.3d 1178, 1187-88 (11th Cir. 2011) *citing United States v. Arias-Izquierdo*, 449 F.3d 1168, 1178 (11th Cir. 2006). "A defendant is not entitled to cross-examine in whatever way, and to whatever extent, the defense might wish." *Barrington*, 648 F.3d at 1188 *citing Delaware v. Fensterer*, 474 U.S. 15, 20 (1985).

> The Sixth Amendment is satisfied so long as a defendant is permitted cross-examination which exposes the jury to facts sufficient to evaluate the credibility of the witness and enables defense counsel to establish a record from which he properly can argue why the witness is less than reliable.

*Barringon*, 648 F.3d at 1188 *quoting United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1371 (11th Cir. 1994). Accordingly, Defendant should be allowed to ask the victim "proper impeachment questions" that may trigger

the victim's right against self-incrimination and the victim can choose to invoke should he please. *See generally United States v. Pilcher*, 672 F.2d 875, 878 (11th Cir. 1982). Likewise, Defendant should be allowed to cross-examine the victim on non-incriminating aspects of his testimony such as his criminal record, the existence of present charges, any inconsistencies in his testimony, and his previous equivocal identification of a different perpetrator.

The Government provides this trial brief so that the parties and the Court are on the same page regarding the victim's testimony and the interplay between his right against self-incrimination and Defendant's right to confront his accuser.

### 3. Count Three Indictment Date Issue

Count Three of the indictment bears the date "on or about September 3, 2021." *See* Doc. 3, p. 4. The allegations are that the charged conduct occurred on October 8, 2021. "When the government charges that an offense occurred "on or about" a certain date, the defendant is on notice that the charge is not limited to the specific date or dates set out in the indictment." *United States v. Reed*, 887 F.2d 1398, 1403 (11th Cir. 1989) *citing United States v. Creamer*, 721 F.2d 342 (11th Cir. 1983). A variance of one month between the date on the indictment and the date of the crime is not a fatal variance. *See generally Reed*, 887 F.2d at 1403. The

Government provides this brief to identify the issue and flag the Government's position.

### 4. Stipulations

The parties have entered into several factual stipulations in this matter. *See* Docs. 103, 104, 105, 106, 107, 108. These stipulations cover several different evidentiary aspects. The Government seeks guidance from the Court as to how it would like these stipulations proffered to the jury. Would the Court prefer that all the stipulations are tendered together at one time, or would the Court allow the Government to enter the stipulations individually at times when they become naturally relevant based upon witness testimony? The Government would prefer the latter but will follow the Court's instructions.

    Respectfully submitted,

    JILL E. STEINBERG
    UNITED STATES ATTORNEY

    *Bradley R. Thompson*
    Bradley R. Thompson
    Assistant United States Attorney
    Georgia Bar No. 706187

P.O. Box 8970
Savannah, Georgia 31412
(912) 652-4422